[Crim. No. 5989.   Second Dist., Div. Two.   Apr. 17, 1958.]

THE PEOPLE, Respondent, v. ALBERT JOSEPH KOSTAL, Appellant.

Joseph M. Rosen, under appointment by the District Court of Appeal, and Harold J. Ackerman for Appellant.

Edmund G. Brown, Attorney General, and John A. Vander Lans, Deputy Attorney General, for Respondent.

FOX, P. J.—Defendant was convicted of armed robbery. He was charged with and admitted three prior convictions, which resulted in his imprisonment. Defendant's motion for a new trial was denied and he was sentenced to the state penitentiary, the prior and present sentences to run consecutively. Defendant has appealed from the order denying his motion for a new trial and from the judgment.

Defendant escaped from Folsom Penitentiary on November

21, 1956. He came to the Los Angeles area where he remained until November 29th. Shortly before midnight on November 25th John Barkley's gunshop in Van Nuys was burglarized and two automatic pistols were stolen. On November 26th, at approximately 8:45 p. m., John B. Hood, manager of Rand's Round-Up, a restaurant located on Wilshire Boulevard in Los Angeles, was seated in a booth at the right of the cash register facing the door; he observed defendant enter the restaurant so he arose and went behind the cash register. Defendant was dressed in army fatigue clothes and was wearing a fatigue cap. When Hood reached the cash register defendant was within an arm's length of him. Defendant pulled a gun and said to Hood: "Give me everything you've got." Hood stepped aside and told him to help himself. Defendant reached into the cash register and took $385. Defendant had a .45 caliber automatic, which was the same type as that previously taken from the Barkley gunshop. Hood described defendant as approximately 6 feet tall, 35 years old, "kind of a sleepy-eyed sort of person," and weighing 135 to 140 pounds.

George H. Hardy was in the café, and while approaching the cash register to buy dinner tickets, observed defendant in front of the register speaking to Hood. When Hardy was 3 or 4 feet from the two men defendant turned toward him, pointed a gun at him, and told him to step back. He obeyed and raised his eyes to the ceiling. He did not see defendant leave the restaurant. Hardy's observation of defendant covered a period of from 10 to 15 seconds. He described defendant as approximately 6 feet tall, weighing 180 pounds, dressed in olive drab fatigue clothes, and wearing a cap of the same color. Both Hood and Hardy identified defendant from photographs that were shown them by the police officers.

Defendant was apprehended in Kansas City, Missouri, about the middle of January, 1957. The property custodian of the Kansas City police department turned over to Deputy Sheriff Lightner of Los Angeles a .45 caliber automatic which had been found in the possession of the defendant when he was arrested. Officer Lightner observed that "The safety, which is on the left rear portion of the gun lever, had been wired down with real small wire." He asked defendant why the wire was on the safety. The defendant took the gun and stated: "This safety will fall out if it is not wired down, so I had to wire it down to keep it from falling out." Defendant "demonstrated it by taking the revolver and shaking it and

turning it on its left side and showing how the lever did fall out.'' Defendant, however, declined to explain, when the officer asked him, where he had obtained the gun. The defendant stated: ''I don't wish to discuss anything regarding it.''

Defendant was arraigned on the charge herein on February 11, 1957, in Department 41 of the superior court. Immediately following arraignment defendant and some other prisoners forced their way out of the detention tank and defendant escaped. Some days later he was located at a home in Whittier, California, and was rearrested.

Defendant denied any connection with the robbery of Rand's Round-Up. According to his testimony, he spent the evening in question at a theater in Los Angeles which was showing foreign films. He claimed to have been with a friend, Arthur Watson, who was confined in the county jail at the time of the trial. Defendant also denied any connection with the breaking into and entering of Barkley's gunshop. He refused to answer questions relative to his possession of a Colt .45 automatic at the time of his arrest in Kansas City on the ground that his answer might tend to incriminate him. Defendant is 5 feet 11 inches in height; his normal weight varies from 170 to 180 pounds.

William Meyer, an inmate of San Quentin Prison, was at liberty in Los Angeles on November 26, 1956. Meyer testified that at approximately 9 p.m. on that date he entered Rand's Round-Up on Wilshire Boulevard wearing a green, army fatigue jacket, trousers and a cap, and that he had in his possession a .45 caliber automatic which he later disposed of in Tijuana. He further testified that he approached the counter where the cash register was located and asked the manager for the money from the register, but he refused to state whether he exposed his gun on the ground that his answer might tend to incriminate him. He further stated that some people had told him he had ''sleepy eyes'' and others that he had ''marijuana eyes.'' His weight was approximately 185 pounds, and he was 6 feet 2 inches in height. He further stated that he had been convicted six times.

Defendant ''does not question the sufficiency or weight of the evidence'' to sustain his judgment of conviction. His position is that ''if the errors complained of had not occurred it is reasonable to believe that the jury could have accepted the facts favorable to defendant and returned a verdict of not guilty.''

█ Defendant's first contention is that the court erred and abused its discretion in denying his request for examination of the police reports of the crime to determine whether a disparity existed between Hood's statement to the police and his testimony at the trial. In support of this contention he relies on *People* v. *Riser*, 47 Cal.2d 566 [305 P.2d 1]. That case, however, does not reach defendant's point. The court stated, on pages 585-586: "The decisions of this court have always impliedly recognized that on a proper showing a defendant in a criminal case can compel production when it becomes clear during the course of trial that the prosecution has in its possession relevant and material evidence. Production has been denied, not on the ground that there was never any right to it, but because the requirements justifying production had not been met in the particular case. [Citation.]" The court cited with approval *People* v. *Glaze*, 139 Cal. 154 [72 P. 965], and pointed out that the court there refused to order production of a statement that appeared to the court to be inadmissible for any purpose, even for impeachment, since "[t]he witness had neither signed the statement nor adopted it in any way." (P. 586.) In the Glaze case, the court delineated the circumstances under which a statement could be used for the purpose of impeaching a witness by showing that he had made statements out of court inconsistent with testimony given by him on the trial. The court stated (p. 157): "The only statements that can be used for that purpose, if in writing, are statements made by the witness himself, either directly in his handwriting or over his signature, or indirectly by his adoption of, or admission of, the correctness of a written report of his statements made by some other person. He cannot be held responsible for a statement taken down by another purporting to be a report of his oral declarations, unless he has been made acquainted with the contents of such statement, and directly or indirectly admitted that it was correct."

From these authorities it is clear that the police report of the robbery by Hood could not be used for purposes of impeaching his testimony in the absence of a prima facie showing that he had either written or signed the statement, or that he had adopted or approved it, or otherwise acknowledged its correctness. In the absence of a proper foundation having been laid therefor, it was neither error nor an abuse of discre-

tion to deny defendant's request to see the police report in question.

Defendant's second contention is that "The court was without jurisdiction in that the information was fatally defective." He argues that "the facts stated did not constitute a public offense in that the Information failed to allege ownership or possession of the property taken was in someone other than the defendant." Section 211 of the Penal Code defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accompanied by means of force or fear." This same point was raised in *People* v. *Wade*, 71 Cal.App.2d 646 [163 P.2d 59]. In rejecting the defendant's contention, the court stated (p. 658) : "It is perfectly clear under numerous recent authorities that the information is amply sufficient in this respect, particularly in view of the 1927 amendment to Penal Code, sections 951 and 952, liberalizing the rules of pleading, and in the light of the fact that the gravamen of the offense of robbery is the deprivation of possession and not ownership. [Citations.]" To the same effect, see *People* v. *Covington*, 1 Cal.2d 316, 318-320 [34 P.2d 1019] ; *People* v. *Voiler*, 2 Cal.App.2d 724, 726 [38 P.2d 833].)

The information herein as amended alleged that defendant "did willfully, unlawfully, feloniously and by force and fear take from the person, possession and immediate presence of John Hood" certain described property.

From the foregoing, it is clear that the amended information stated a public offense. The cases relied upon by defendant no longer state the law in light of the 1927 amendment to Penal Code, sections 951 and 952.

Defendant's third contention is that the trial court erroneously permitted the prosecution to introduce evidence of other crimes committed by him which were unrelated to the crime for which he was being tried. He first complains of the evidence tending to show that he burglarized Barkley's gunshop and stole a .45 caliber automatic the night before the robbery for which he was on trial. Defendant had the gun in his possession when he was arrested in Kansas City.

While it is true that evidence of other crimes is ordinarily inadmissible in a criminal case, it is well settled that such evidence is admissible if it is relevant to prove the commission of the crime charged. (*People* v. *Dabb*, 32 Cal.2d 491, 499 [197 P.2d 1].) "The general test of relevancy is whether the evidence tends logically, naturally, and by reason-

able inference to establish any fact material for the People or to overcome any material matter sought to be proved by the defense. If it does, then the evidence is admissible whether or not it embraces the commission of another offense and whether the other crime be similar or dissimilar.'' (*People* v. *Dabb, supra,* p. 500; see also *People* v. *Sykes,* 44 Cal.2d 166, 170 [280 P.2d 769] ; *People* v. *Peete,* 28 Cal.2d 306, 315 [169 P.2d 924], and cases cited therein.) **[3b]** It is clear that the aforementioned evidence tended to establish that defendant committed the robbery in question. Hood testified that the stolen gun was similar to the one which defendant carried when he committed the robbery. It was a reasonable inference that defendant had stolen the gun in order to have a weapon with which to commit the robbery shortly thereafter. The probative value of this evidence far outweighed any prejudicial effect it might have had upon the jury.

Secondly, defendant complains of the evidence showing his escape from custody immediately after his arraignment on the robbery charge. This evidence of flight was clearly admissible as tending to show defendant's consciousness of guilt. (*People* v. *Ellis,* 188 Cal. 682, 692-693 [206 P. 753] ; see also *People* v. *Santo,* 43 Cal.2d 319, 330 [273 P.2d 249] ; *People* v. *Hoyt,* 20 Cal.2d 306, 313 [125 P.2d 29].) Defendant asserts that his escape from custody was too remote because it occurred some two months after the commission of the robbery. This argument was properly rejected in the Ellis case. Defendant also asserts that evidence of his escape was immaterial because it was his *second* flight in connection with this same robbery charge; he had fled to Kansas City shortly after the commission of the robbery and before he was taken into custody. But the fact that the escape from custody was defendant's second flight makes it doubly indicative of his consciousness of guilt.

Defendant's next contention is that the judgment of conviction is void and unconstitutional. He presents four arguments in support of this claim. He first argues that the portion of the indeterminate sentence law which prohibits the court in imposing sentence from fixing the ''terms or duration of the period of imprisonment'' (Pen. Code, § 1168) is unconstitutional because it deprives the superior court of its constitutional grant of jurisdiction to proceed to a final determination of the rights of the party before it. He also argues in this connection that the indeterminate sentence law

confers judicial powers upon a nonjudicial body (the Adult Authority), thereby rendering the law unconstitutional. Both of these arguments are answered by the following discussion in *In re Lee,* 177 Cal. 690, 692-693 [171 P. 958] : "It is generally recognized by the courts and by modern penologists that the purpose of the indeterminate sentence law, like other modern laws in relation to the administration of the criminal law, is to mitigate the punishment which would otherwise be imposed upon the offender. These laws place emphasis upon the reformation of the offender. They seek to make the punishment fit the criminal rather than the crime. They endeavor to put before the prisoner great incentive to well-doing in order that his will to do well should be strengthened and confirmed by the habit of well-doing. Instead of trying to break the will of the offender and make him submissive, the purpose is to strengthen his will to do right and lessen his temptation to do wrong. If the purpose of the law is to mitigate the punishment, the law is not *ex post facto* unless it can clearly be seen that notwithstanding the beneficence of the law it may result in the individual case in depriving the prisoner of some well-defined right. It has uniformly been held that the indeterminate sentence is in legal effect a sentence for the maximum term. It is on this basis that such sentences have been held to be certain and definite, and therefore not void for uncertainty. [Citations.] In answering the claim that the authority vested by the indeterminate sentence law in the board of prison directors [now replaced by the Adult Authority] is a delegation of either legislative or judicial powers to an executive body, it is pointed out that the legislative function is filled by providing the sentence which is to be imposed by the judicial branch upon the determination of the guilt of the offender. This is done by the enactment of the indeterminate sentence law. The judicial branch of the government is intrusted with the function of determining the guilt of the individual and of imposing the sentence provided by law for the offense of which the individuals has been found guilty. The actual carrying out of the sentence and the application of the various provisions for ameliorating the same are administrative in character and properly exercised by an administrative body.'' (See also *In re Larsen,* 44 Cal.2d 642, 647 [283 P.2d 1043], *appeal dismissed,* 350 U.S. 928 [76 S.Ct. 312, 100 L.Ed. 811].) It is clear from the foregoing that the indeterminate sentence law neither prevents the superior court from making a full deter-

mination of the rights of the defendant nor confers judicial powers upon a nonjudicial body. The judicial function is complete when the court has imposed upon the defendant the sentence provided by law for the crime for which he has been convicted. The function of carrying out that sentence is administrative rather than judicial, and the Adult Authority may properly supervise that function. (*People* v. *Leiva*, 134 Cal.App.2d 100, 103 [285 P.2d 46].)

■ There is clearly no merit in defendant's argument that the indeterminate sentence law violates the due process and equal protection clauses of the United States Constitution. A judgment pursuant to that law is both definite and certain, and meets the requirements of due process and equal protection. (*In re Larsen, supra,* p. 648; *In re Lee, supra,* p. 693; *People* v. *Leiva, supra,* p. 103.)

■ Defendant's fourth argument in relation to the validity of the judgment is that he is denied his constitutional right to a public trial since he will have to appear before the Adult Authority at a private meeting for the fixing of his term of imprisonment. This argument overlooks the fact that defendant's appearance before the Adult Authority is in no sense a trial. Defendant's trial terminated upon his being convicted and sentenced. His hearing before the Adult Authority will be simply an administrative proceeding to determine what sentence within the limits prescribed by law the defendant should be required to serve.

■ Defendant's final contention is that the trial court erred in ordering his present sentence to run consecutive to his prior sentence. Defendant was already serving sentences at the time of his instant conviction. Since the Adult Authority in 1952 fixed his term of imprisonment for one of his robbery convictions at "life," defendant argues that his present sentence is invalid in that it has been set to run consecutive to a life sentence. Penal Code, section 669, authorizes the trial court to direct that sentences shall run consecutively, with the provision that "if the punishment . . . is expressly prescribed to be life imprisonment . . ., then the terms of imprisonment on the other convictions, whether prior or subsequent, shall be merged and run concurrently with such life term." All of defendant's prior convictions have been for robbery, and in all of them indeterminate sentences have been imposed. The punishment for robbery is not *expressly prescribed* to be life imprisonment; therefore, the pertinent exception in section 669 does not prevent any of

defendant's sentences from running consecutively. (See *In re Quinn*, 25 Cal.2d 799, 803-804 [154 P.2d 875].)　　This result is not affected by the fact that the Adult Authority later fixed defendant's sentence at life imprisonment because the terms "expressly prescribed" in section 669 mean expressly prescribed by statute. (See *People* v. *Rivas*, 85 Cal. App.2d 540, 542 [193 P.2d 151].) Any later action by the Adult Authority has no effect in this regard.

　　Defendant argues that the 1951 amendment to section 671 of the Penal Code "expressly prescribes" that indeterminate sentences without fixed maximums shall be the equivalent of life imprisonment. That section now reads: "Whenever any person is declared punishable for a crime by imprisonment in the state prison for a term not less than any specified number of years, and no limit to the duration of such imprisonment is declared, punishment of such offender shall be imprisonment during his natural life subject to the provisions of Part 3 of this code." Before the amendment in 1951 section 671 read as follows: "Whenever any person is declared punishable for a crime by imprisonment in the state prison for a term not less than any specified number of years, and no limit to the duration of such imprisonment is declared, the court authorized to pronounce judgment upon such conviction may, in its discretion, sentence such offender to imprisonment during his natural life, or for any number of years not less than that prescribed." It seems obvious from a comparison of the two provisions that the purpose of the amendment was to remove from the trial court the discretion to fix the term of the defendant's incarceration and to place such discretion in the Adult Authority (through the provisions of part 3 of the Penal Code). Although indeterminate sentences with no maximums are now deemed to be equivalent to a sentence of imprisonment for the natural life of the defendant, the Adult Authority is given the right to determine and redetermine the length of time he is to be imprisoned. (Pen. Code, § 3020.) It is thus clear that such sentences are to be considered life sentences for a limited purpose only and were not meant to come within the proviso in section 669. To apply defendant's interpretation would prevent convictions from running consecutively when the first conviction was for one of the more serious crimes (i.e., one where there is no fixed maximum penalty), and would have the effect of overruling such cases as *In re Quinn, supra; People* v. *Rivas, supra;* and *People* v. *Collins,* 99 Cal.App.2d 780 [222 P.2d

686]. The court in the Quinn case stated (pp. 800-801): "Certainly an indeterminate sentence without a fixed maximum is regarded for certain purposes as having the effect of a life sentence until and unless the prison term board [now replaced by the Adult Authority] has acted and fixed a term for years [citing cases] but this proposition of law does not preclude our recognizing the reality that, in the absence of action by the board, an indeterminate sentence *is an indeterminate sentence.* It is neither a life sentence nor a fixed term sentence; it is entitled to recognition as a distinct *species intelligibilis.* The fact that for some purposes it has the legal effect of a life sentence does not mean that it must be regarded as the equivalent of a life sentence for all purposes. [Citation.] A defendant against whom such a judgment has been pronounced may or may not be required to spend the entire term of his natural life in prison." We do not feel that the views expressed in the Quinn case are altered by the fact that later the Adult Authority may in fact fix a defendant's previous sentence at life. The sentence is subject to constant redetermination by that body and is thus not irrevocably a "life sentence" either before or after the Adult Authority's initial determination. Moreover, as we have already suggested, the previous sentence does not come within the purview of the exception in section 669 regardless of any later action taken by the Adult Authority. We are convinced that the Legislature, in amending section 671, did not intend the result for which defendant argues.

The case upon which defendant relies, *People* v. *Pearson,* 150 Cal.App.2d 811, 821-822 [311 P.2d 142], is not in point. There the defendant previously had been adjudged an habitual criminal under Penal Code, section 644, which expressly prescribes the punishment of life imprisonment. The proviso in Penal Code, section 669, was therefore applicable to his subsequent convictions.

The judgment and order are affirmed.

Ashburn, J., and Herndon, J., concurred.

A petition for a rehearing was denied May 7, 1958, and appellant's petition for a hearing by the Supreme Court was denied June 11, 1958.