[Crim. No. 8001. Second Dist., Div. One. Sept. 19, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. WALTER RAYMOND DEMES, Defendant and Appellant.

Morris Lavine for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—In this, the last of three trials, Demes was convicted by a jury of murdering one Browse and of assault with a deadly weapon with intent to murder Adam Safian, a police officer. The first trial resulted in a jury disagreement. At the second trial Demes and his codefendant, Kerfoot, were convicted of both offenses charged in the information. Kerfoot abandoned his appeal. The judgment as to Demes, however, was reversed by this court because of certain procedural errors violative of due process and the reception of inadmissible evidence prejudicial to Demes. (184 Cal.App.2d 622 [7 Cal.Rptr. 674], *sub nom. People* v. *Kerfoot.*) The present appeal is from the judgment and the order denying a new

trial, the latter having been made before the effective date of the 1961 amendment to section 1237, Penal Code. An attempted appeal from certain nonappealable orders designated in the notice of appeal must be dismissed.

In conformity with the views of this court on the prior appeal, and at Demes' request for such representation, present counsel was appointed to defend him at the third trial. Defendant personally entered a plea of once in jeopardy. Following the denial of preliminary motions and defendant's admission of the two prior felony convictions alleged in the information, the matter proceeded to trial some two months after the substitution of present counsel. The trial was a lengthy one—the reporter's transcript exceeds 2,500 pages. Upon the denial of a new trial, defendant was sentenced to life imprisonment; the court also made a finding that defendant was an habitual criminal.

Nineteen assignments of error are listed and argued, the first of which challenges the sufficiency of the evidence to support the verdict. Since the People's case in the third trial, save for the inadmissible matters previously mentioned, was essentially the same as that produced in the second trial, we adopt the summary of such evidence found in the prior opinion (184 Cal.App.2d 622, 632-634) with appropriate deletions indicated by brackets together [ ] and appropriate additions indicated by brackets enclosing such additions or insertions : "On January 19, 1959, a sporting goods store in Reno, Nevada, was burglarized and several revolvers or pistols and some other items were stolen therefrom. Among the guns taken was a .22 calibre Smith and Wesson, Serial No. 26,780 and a .38 calibre Smith and Wesson, Serial No. 126,586. There was also a green jacket missing." [ ]

[On January 20, 1959, Mrs. Marion Karr was working at the counter of a cafe owned by herself and her husband in North Las Vegas. She served Demes and Kerfoot a meal. When they had finished eating, about 30 minutes later, Kerfoot pulled a gun out of his pocket and held it on the waitress. Demes said to Kerfoot: "Put that down, put that thing away." He then left, but Kerfoot told Mrs. Karr: "I want everything that's in that register." $57.00 was taken by Kerfoot.]

[On the morning of January 23, 1959, Demes and Kerfoot entered a grocery store in Phoenix, Arizona. Kerfoot was armed with a short-nosed .38-calibre revolver and demanded of Ben Pilon, an employee, that he put all the money in a

paper bag. Pilon complied with this demand—in a sum approximating $270. The customers were made to lie on the floor, and Pilon was ordered to do likewise. He was then robbed of $10. Demes and Kerfoot were in the store about three or four minutes, during which time Demes stood at the entrance about 4 feet from Pilon.]

"On January 25, 1959, a barmaid saw the defendants in a bar in Hollywood that evening. She left the bar about 1:20 a.m. (January 26) and the defendants preceded her by about half an hour to 45 minutes. While at the bar Kerfoot showed a gun to the bartender and asked if he could use it and the bartender answered 'No.'

"Nathan Fram and Leland Browse were working in Fram's liquor store on Hollywood Boulevard at about 1:20 a.m. or 1:25 a.m. on January 26, 1959. Kerfoot entered the store with a gun in his hand and Fram told him to put the gun away and to get out. Kerfoot went towards Browse and demanded the money. Fram walked behind the counter and saw Adam Safian, a policeman, starting to enter the store. Browse called to Safian, 'Watch this man, he's got a gun!' Kerfoot turned around and started shooting. Browse ran out of the store and Fram heard guns firing. Safian was hit twice and fell backwards. Safian saw that the gun Kerfoot had was a .22 or .25 calibre. Browse was shot and fell down and Kerfoot ran around the corner. Safian fired several shots at Kerfoot as he ran. Kerfoot got into a 1954 or 1955 Pontiac automobile on the passenger's side. The car started moving before the car door closed. Two shots were fired at the car by Safian.

"At about 10 or 15 minutes before 2 a.m. the defendants returned to the bar where they had previously been and were served a drink. They stayed at the bar until between 2:15 and 2:30 a.m. at which time they walked north to Hollywood Boulevard with the bartender.

"At about 2:30 a.m. on January 26, 1959, Officer Kjorlien saw a Pontiac automobile parked near 6709 Selma Street. He noticed a crease on the car over the rear window which appeared to have been made by a bullet.[1] Officer Seela arrived and opened the trunk of the car and found therein a .38 calibre revolver. The car was locked up again. At about 3:55 a.m. the defendants were walking in a westerly direction on Selma Avenue in the general direction of the Pontiac car.

[1][In the opinion of a qualified expert this "crease" was made by a bullet or bullets travelling from the rear towards the front of the car.]

One of the defendants said, 'There it is.' When they reached the parked automobile they kept on walking and turned north on Highland Avenue. The officers followed and saw the defendants standing back of some bushes. The defendants were ordered by the police (who identified themselves as such) to come out with their hands in the air. A second command was given and Kerfoot came to the sidewalk and after a further command Demes came out. The defendants were handcuffed and taken to the vicinity of the parked Pontiac car. Some keys were removed from Demes' pocket which unlocked the doors and the ignition of the Pontiac car. The defendants were taken to the police station. Keys were taken from Kerfoot's pocket which also unfastened the car locks. Two live .22 calibre shells were also found in Kerfoot's pockets.

"An autopsy was performed on Browse and it was found that he died from a gunshot wound in the chest.[2]

"Officer Hancock found a pair of sunglasses in the Pontiac car which contained a thumb print which matched a thumb print of Kerfoot. On January 28, 1959, at the rear of 6709 Selma Street, Hancock found a .22 calibre revolver lying under some asparagus fern bushes. Near the gun were some heel prints. A plaster cast of one of the heel prints was taken and later compared with the heel of one of Kerfoot's shoes.

A most favorable comparison was noted. The trousers of Kerfoot contained some particles of asparagus fern leaves."

On the prior appeal we had occasion to observe, in reply to the contention presently made, that except for the errors there discussed "the evidence would have been sufficient to sustain the judgment. . . ." (184 Cal.App.2d 622, 648.) Despite defense testimony to the contrary (which merely raised certain conflicts), and despite counsel's vigorous argument that the People's case is lacking in sufficient substantiality to warrant an affirmance, we are of the same view previously entertained as to this phase of the instant prosecution. Demes recognizes that if he aided and abetted in the commission of the crimes, he is equally guilty regardless of the precise acts he performed.[3] Accordingly, it is

[2] [A .22-calibre lead slug, found between the heart and the lungs, was removed from the body.]

[3] "All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission ... are principals in any crime so committed." (Pen. Code, § 31.)

argued that there was an insufficient showing that two persons were riding in the car which sped away from the scene of the crimes. As already noted, however, the vehicle started moving before the car door closed and Kerfoot had entered on the passenger side; there was also competent testimony by a prosecution witness that two males were in the car when it left the scene. The further argument is made that Demes was never identified as the second person in the subject automobile. But admittedly he was the owner of the vehicle; he and Kerfoot were in each other's company immediately before and after the shooting; he denied that he had left the bar although the falsity of this testimony was established by two witnesses; there were other incriminating circumstances which include his actions and statements following the homicide. It was for the jury to determine whether the above circumstantial evidence sufficiently implicated the defendant. (*People* v. *Cullen,* 37 Cal.2d 614, 625 [234 P.2d 1]; *People* v. *Scott,* 176 Cal.App.2d 458 [1 Cal.Rptr. 600].)

Further, on the issue that he did not aid and abet, it is contended by Demes that the prosecution failed to show that he knew of Kerfoot's plans to commit a robbery. While presence at the scene of the crime does not alone establish that appellant was an abettor (*People* v. *Hill,* 77 Cal.App.2d 287 [175 P.2d 45]), the test seems to be "whether the accused in any way, directly or indirectly, aided the perpetrator by acts or encouraged him by words or gestures (*People* v. *Villa,* 156 Cal.App.2d 128, 134 [318 P.2d 828]), and previous knowledge of what was about to transpire may be reasonably inferred from the defendant's actions at the time and place in question. In the present case, defendant's car was not parked in front of the liquor store but further up the street; the motor was kept running while Kerfoot was in the store; after Kerfoot's return, his car was immediately driven away at high speed with the lights off and with utter disregard of the fact that it was being fired at from the rear. All of these circumstances, considered together, clearly establish that Demes was fully aware of Kerfoot's plans. It becomes immaterial that these plans fell short of their objective; contrary to Demes' assertions in that regard, there was sufficient evidence that a robbery was attempted and, of course, the statute provides that a killing is murder in the first degree when committed in the perpetration or attempt to perpetrate certain felonies, including robbery. (Pen. Code, § 189.)

Since it is made a separate assignment of error, we

next discuss the claim that the evidence did not sufficiently establish an attempt to rob the liquor store. Demes contends that Kerfoot's actions on the early morning in question did not manifest an intent to perpetrate a robbery—"He was merely a man displaying a gun, entering a liquor store at close to closing time in the morning." Demes also states that his confederate did not say anything that indicated that he was intent on robbery. "The intent with which an act is done may be gathered from all the circumstances shown in evidence, and is a question of fact." (*People* v. *Bateman*, 175 Cal.App.2d 69, 74 [345 P.2d 334].) When Kerfoot (gun in hand) entered the store, he stated to Browse: "Pass it over, all of it." From these circumstances it can reasonably be said that the jury had no other alternative but to infer that he had the specific intent to rob. The subsequent killing, therefore, was murder in the first degree by force of the governing statute. (Pen. Code, § 189.)

As noted at the outset, the present proceeding was the third time Demes stood trial for the offenses charged; he now contends that he was twice placed in jeopardy because the jury at the first trial assertedly failed to vote on his guilt or innocence and because he was denied the benefit of counsel at the second trial. There is merit to neither contention. The jeopardy defense is not available if the jury is discharged for some recognized proper cause. Section 1141 of the Penal Code provides that "the cause may be again tried" where a jury "is discharged or prevented from giving a verdict by reason of an accident or other cause"; and section 1140 of the same code declares that "the jury cannot be discharged after the cause is submitted to them ... unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." The record of the proceedings at the first trial reveals that the jury foreman, in response to the court's questions, stated that seven ballots had been taken; that "right from the first there has been practically no division, no separation from the first ballot"; that "a vote was taken and it was unanimous that we could not come to a decision." After further colloquy between the court and the foreman, a mistrial was declared and the jury discharged. Although it has been observed that the jurors should ordinarily be questioned individually as to the probability or otherwise of reaching a verdict (*Paulson* v. *Superior Court*, 58 Cal.2d 1, 7 [22 Cal.Rptr. 649, 372 P.2d 641]), the statute specifies no

particular procedure and the final decision is in effect left to the court's broad discretion.

In answer to Demes' specific contention that no vote was taken on his guilt or innocence, the record discloses this additional colloquy between the court and the jury foreman: "THE COURT: Have you considered the defendant in your deliberations? THE FOREMAN: We considered Mr. Demes, very much so. THE COURT: Have you balloted on him? THE FOREMAN: It was on both of them we were balloting on."

While the above quoted and other excerpts of the proceedings at the first trial were offered by the prosecution with respect to the special plea (of jeopardy), defendant's counsel at the third trial sought to negate not only the showing of disagreement reflected by the record but also that the jury ever balloted on Demes. He endeavored to do so by calling a juror at the first trial who testified that she never voted on Demes' guilt or innocence. The answer of this witness was stricken for the purpose of a prosectution objection, and the objection was sustained. The ruling was not erroneous, as defendant contends. It was wholly immaterial, in our opinion, whether the jury did or did not ballot; interestingly enough, furthermore, no authority is cited for the proposition that the taking of a formal ballot is a condition precedent to a determination, after inquiry of the jury, that a verdict cannot be reached. Additionally, and by analogy, such testimony would tend to impeach the result of the jury's deliberations announced through its foreman. But " 'it is well settled that jurors are legally disabled to impeach their verdict by any means, whether it be by affidavit or by testimony . . . except only in the cases provided by statute.' [Citation.]" (*People* v. *Sutic,* 41 Cal.2d 483, 495 [261 P.2d 241].)

Likewise unsustainable is the claim that defendant was placed in jeopardy at the second trial because he was there and then denied the benefit of counsel. Again no authority is cited for this novel contention. Section 1262 of the Penal Code, amended in 1951, provides that a reversal shall be deemed an order for a new trial unless the appellate court shall otherwise direct; on the former appeal this court did not "otherwise direct" and defendant, accordingly, was not entitled to a discharge. See 1 Witkin, California Crimes, section 215, page 205. Too, the United States Supreme Court is apparently not of the view defendant has asked us to adopt; thus, in *Gideon* v. *Wainwright,* 372 U.S. 335 [83

S.Ct. 792, 9 L.Ed.2d 799] (March 18, 1963) a reversal was ordered on grounds similar to those advanced on the prior appeal herein, but the opinion is devoid of any suggestion that the defendant could not be tried again.

The next assignment of error relates to the asserted denial of a speedy trial. Section 1382 of the Penal Code provides that in the absence of good cause to the contrary the Court must order the action to be dismissed in the following cases: "... 2. When a defendant is not brought to trial in a superior court within 60 days after the finding of the indictment or filing of the information or, in case the cause is to be tried again following a mistrial, an order granting a new trial from which an appeal is not taken, or an appeal from the superior court, within 60 days after such mistrial has been declared, after entry of the order granting the new trial, or after the filing of the remittitur in the trial court"; the same subdivision further provides that an action shall not be dismissed thereunder "if it is set for trial on a date beyond the 60-day period at the request of the defendant or with his consent, express or implied. . . ." The above provisions, says appellant, were not complied with in two separate instances. First, the first trial ended on July 1, 1959, and the defendant assertedly was not again placed on trial until March 14, 1961, more than 18 months later; of course, in making this statement, defendant simply disregards the second proceeding or trial which he apparently considers a nullity. Such reasoning is not sound. Except for the errors discussed on the former appeal, there was an " 'examination before a competent tribunal, according to the law of the land, of the facts or law put in issue in [the] cause, for the purpose of determining such issue.' [Citations.]" (*People* v. *Stokes*, 5 Cal.App. 205, 214 [89 P. 997].) Having had the benefit of a trial and the benefit of a successful appeal, any delays resulting therefrom were errors of law occurring below which this court later corrected. The second instance of noncompliance with the governing statute, according to the defendant, occurred when a period of more than 60 days elapsed from the filing of this court's remittitur (November 17, 1960) and the commencement of the third trial (March 14, 1961). A complete answer to this contention (as well as the companion claim just discussed) is that the record reveals a waiver by defendant of the rights now asserted. On January 13, 1961, present counsel was appointed to represent defendant; trial was then advanced from February 14, 1961,

and on motion of the defendant continued to March 14, 1961. Time was then waived. "It is settled that 'the constitutional right to a speedy trial and the [hereinabove quoted] ... statutory requirements may be waived.' [Citation.] A defendant's consent that his trial be set for a date beyond the limit prescribed 'is equivalent to a postponement upon his application' [citation] and hence constitutes a waiver of the right; and consent will be *presumed* if the defendant fails to take the necessary procedural steps of making timely objection to such delay and thereafter moving for dismissal. [Citation.] The right to a speedy trial must therefore be asserted, if at all, in the court where the prosecution is pending, and prior to the commencement of trial. [Citation.] It is too late to raise the point for the first time on appeal. [Citation.]" (*People* v. *Wilson,* 60 Cal.2d 139, 146 [32 Cal.Rptr. 44, 383 P.2d 452].)

There is no merit to defendant's next contention that his rights under the Fourteenth Amendment (U.S. Const.) were violated by the reception of evidence establishing a conspiracy, a crime not charged in the information. Such evidence was admitted under the theory that he and Kerfoot conspired to commit a series of robberies which culminated in the crimes upon which they were brought to trial. It has been consistently held that a conspiracy need not be pleaded if the evidence actually shows the existence of one. See *People* v. *Pike*, 58 Cal.2d 70, 87 [22 Cal.Rptr. 664, 372 P.2d 656], and cases there cited.

The *Pike* case also answers the companion claim that it was error to admit evidence of the Nevada and Arizona robberies. There it was likewise argued that certain robberies "were not charged in the information, and hence ... the admission of evidence relating thereto deprived him of a fair trial"; but, the Supreme Court pointed out that "The subject evidence ... was not offered to show a general criminal disposition, but to establish that armed robberies were committed by Pike while the two defendants were together ... shortly before the attempted armed robbery of the Lucky store and the shooting of Officer Kent. The evidence 'tends logically and by reasonable inference' to establish that fact [citation], and hence was admissible to show the common design of the criminal enterprise undertaken by the defendants. [Citations.]" (*People* v. *Pike, supra,* 58 Cal.2d 70, 89.) In the instant case there was sufficient similarity between the prior robberies and the crimes charged in the information to indicate a common plan, pattern or scheme. In each instance

the defendant and Kerfoot obtained (or attempted to obtain) money—Kerfoot took affirmative action while defendant stood by. In the Arizona robbery it could be inferred that defendant acted as a lookout; in the subject attempted robbery he performed the same role and also drove the get-away car. Too, evidence of scheme or plan may be shown by the theft of a pistol (in this case, the Reno burglary) and its subsequent use in an attack upon a person (*People* v. *Sykes*, 44 Cal.2d 166, 170 [280 P.2d 769]); and in this connection it has been held that a similarity of the stolen gun to that used in a subsequent robbery will support an inference that defendant had stolen the gun for the felonious purposes later carried out. (*People* v. *Kostal*, 159 Cal.App.2d 444, 450-451 [323 P.2d 1020].) Finally, there is no merit to the point that the prior offenses were committed in other states and therefore evidence pertaining thereto was inadmissible. Neither reason nor authority supports such a far-stretched argument.

Shortly after the events at the liquor store, as noted earlier in the summary of relevant facts, investigating officers found a Pontiac car (the keys to which were subsequently found in defendant's possession) parked near 6709 Selma Street. The car was locked, and one of the officers opened the trunk with a slotted key and lock pick and removed two suitcases and a .38-calibre Smith and Wesson revolver. Over defendant's objections the articles were received in evidence; and he claims illegal search and seizure. The governing rules have been stated before. The federal Constitution does not prohibit an officer from searching a vehicle and subsequently using that found therein in a criminal prosecution when there is reasonable cause to believe that it contains contraband or stolen property. (*Scher* v. *United States*, 305 U.S. 251 [59 S.Ct. 174, 83 L.Ed. 151].) It is well established in California that a valid search of a vehicle may be made in the absence of either a lawful arrest or a valid search warrant. (*People* v. *Garrison*, 189 Cal.App.2d 549 [11 Cal.Rptr. 398].) The burden rests on the prosecution to show proper justification; the determinative question then is whether, in the absence of a warrant or arrest, the search was a reasonable one. (*People* v. *Brown*, 45 Cal.2d 640 [290 P.2d 528].) That being so, the next and primary question is whether the officers have reasonable cause to believe that an automobile contains stolen property or contraband; in that connection, "each case must to some extent stand on its own feet under the same general direction of 'reasonable grounds

for belief.' '' (*People* v. *Brajevich*, 174 Cal.App.2d 438, 444 [344 P.2d 815].)

The following circumstances establish the existence of reasonable grounds for the belief there and then entertained by the officers. Officer Kjorlien arrived at the scene of the shooting about 1:30 a.m. He was told that a blue and gray car, possibly a Pontiac, was involved; that it had silver and blue (possibly Nevada) license plates; that shots had been fired at the vehicle. Subsequently the officer was given the description that it was a 1954 or 1955 Pontiac with a gray top and blue on the sides. At approximately 2 a.m. he saw a 1955 Pontiac at 6709 Selma; there were ricochet marks on the top of the car. Officer Seela, who unlocked the trunk, testified that he saw the car at approximately 3 a.m.; it was a two-toned 1955 Pontiac, bearing Nevada license plates. He could find no registration slip on the steering wheel. Further investigation revealed that the radiator was warm, and there was a ricochet mark (as described by Officer Kjorlien). In the above state of the record, it must be held that the several items uncovered by the search were properly received in evidence.

Defendant complains of certain instructions given the jury. First, on the subject of double jeopardy the court informed the jury that while they were exclusive judges of the facts pointing to defendant's guilt or innocence, an exception arose in the case of the special plea of once in jeopardy. The court then stated: ''For purposes of this trial I instruct you with respect to the plea of once in jeopardy that it is not jeopardy where the jury in the first trial did not reach a verdict or verdicts and where it appeared to the trial court in the first trial that there was no reasonable probability that the jury could agree on a verdict or verdicts. In such a case the trial court may declare a mistrial and the case may be retried. It would be extremely difficult, it seems to me, for a jury of laymen to determine such an issue. The jury can resolve the conflicts of evidence and make its determination as to the facts, however, whether or not the facts as so determined establish once in jeopardy presents what is practically a pure question of law. Upon the evidence it is, in my opinion, both as a matter of law and fact, that no verdict or final determination of any issue was ever reached in the first trial and obviously no verdict was ever declared or rendered or recorded in the court in the first trial.

''I therefore advise you to find for the People and against

the defendant on this issue. I am required to inform you, and do so, that you do not have to accept this advice and are free to disregard it if you wish because the final judgment in this matter must be yours."

The court did not err in giving the challenged instruction. While he commented on the evidence, as was his privilege (*People* v. *Scott,* 53 Cal.2d 558, 564 [2 Cal.Rptr. 274, 348 P.2d 882]), he left the special plea to the jury for its determination and told them they were not obliged to follow his advice. For a similar situation see *People* v. *Finch,* 213 Cal. App.2d 752, 761-762, [29 Cal.Rptr. 420].

Defendant also complains that instructions relating to conspiracy and the commission of other crimes should not have been given. The contention is without merit. The admissibility of evidence concerning crimes not charged in the information has already been discussed; however, it was incumbent on the court to give limiting instructions as to the purpose of admitting such evidence. Too, the fact of a conspiracy (although not charged in the accusatory pleading) as in issue; hence, there was no error in instructing upon that subject. (*People* v. *Davis,* 48 Cal.2d 241, 250 [309 P.2d 1].)

Certain procedures were followed by the trial court, after the case had been given to the jury, which defendant now claims constituted error. On the third day of their deliberations, the jury stated to the court that they had reached agreement as to one of the verdicts but not as to the others. They requested the reading of the testimony of four witnesses, including that of the defendant. The entire testimony of a prosecution witness, Polly Fornoff, was then read. Immediately after this reading, the jury was taken to lunch; upon their return, the court was advised (through the bailiff) that they did not desire to have any additional testimony read. There was no objection to this procedure by the defendant, his counsel or the prosecution. There appears to be no requirement that the judge have all testimony reread after the jury has indicated that they have heard as much as they desire to hear. (*People* v. *Warren,* 130 Cal. 678, 681-682 [63 P. 87].) Too, the failure of defendant or his counsel to object is proof enough of the incident's unimportance. It seems to be suggested by the defendant that the jury's decision not to hear additional testimony should have been communicated in open court; however, any possible prejudice (and we see

none) was waived by defendant's silent acquiescence in the procedure followed.

As his next assignment of error, defendant asserts that there was an unlawful communication between the court and the jury; he further contends that the court committed error in refusing to allow him to show such communication. The background facts (developed on the motion for new trial) are as follows: The foreman gave one of the two bailiffs a note, telling the bailiff that the note was to the effect that they were deadlocked. The bailiff then told the trial judge that the jury had a written statement and that they were deadlocked. Asked by defense counsel if the court cared to give his recollection of the episode, the trial judge stated: "The Court's recollection is that this bailiff did come to the Court in the afternoon and advised the Court that the jury had sounded one bell, and that the bailiff then said he went into the jury room, and that he came back into the chambers and advised the Court that he had received a bell, and the Court asked the bailiff whether or not the jury had arrived at a verdict, and he said, 'No,' that the jury wanted to direct some communication to the Court. The Court then stated to the bailiff that this is a matter that was on trial for many, many weeks and that we had, I believe, at that time some case on the calendar—I said to merely advise the jurors to resume their deliberations and 'We will get in touch with them later.' "

Subsequently, the court suggested a stipulation from counsel that he (the court) did not receive any note from the jurors. To this suggestion, defense counsel stated: "Yes, I am willing to include that. Of course, I am willing to include that in the stipulation, but I do wish to make an offer of proof that if this witness were permitted to testify and state the facts, and if he were permitted to produce the note, that there was a note prepared, signed by ten jurors, and that that note set forth that the other two jurors were in some respect in violation of their oaths as jurors, and that there were other matters contained in the note."

Since defense counsel stipulated that the court did not receive a note from the jury, it is difficult to understand the basis of the instant assignment (of error) that there was an unlawful communication between court and jury. It seems to be argued that the trial judge was duty-bound to call the jury into court and ascertain the contents of the note; but the provisions of section 1138 of the Penal Code, governing

here, do not call for any such action unless there is disagreement among the jurors as to testimony or if they desire to be informed on any point of law. In view of the foregoing facts and law, the court did not err in denying defense efforts to establish such communication.

Defendant next contends that the court erroneously adjudged him an habitual criminal; he argues that he was not so charged in the information and that the court erred in taking testimony as to his habitual criminality. The points are without merit, having been expressly rejected in precedent decisions. The information in the instant case is precise insofar as it alleges prior convictions (two in number), the jurisdiction in which each was rendered, the date of each conviction and the service of a prison term pursuant thereto. Furthermore, defendant in open court expressly admitted the matters just mentioned. See *People* v. *Williams,* 193 Cal. App.2d 394 [14 Cal.Rptr. 279], and cases there cited.

Next, error is claimed in the admission and exclusion of certain evidence. First, it is contended that the trial court erroneously permitted the prosecutor to reopen the testimony of Officer Gorey after the completion of his direct examination. By statute and decision the trial court is empowered to regulate the order of proof (Pen. Code, § 1093; *People* v. *Burch,* 196 Cal.App.2d 754, 770 [17 Cal.Rptr. 102]); more specifically, to permit a case to be reopened for further testimony. (*People* v. *Griffin,* 98 Cal.App.2d 1, 47 [219 P.2d 519].) There was no error, as claimed. Second, defendant unavailingly sought to strike the testimony of Clovis Bull, an out-of-state witness at previous trials, which was read to the jury. Because section 686 of the Penal Code applies, foundation testimony was taken of Mr. Bull's statement that he would not attend the trial; there was also testimony that a letter sent to him from the district attorney's office (with a return address) was not answered. With respect to section 686, a finding of the trial court that due diligence has been shown and that the witness cannot be found within the state will not be disturbed unless its discretion in that regard has been abused—there has been no such showing here. As for the claim that the attendance of prosecution witnesses should have been compelled (Pen. Code, § 1334), we recently declared that "the district attorney has no obligation to resort to this statute as a condition precedent to the introduction of the testimony desired." (*People* v. *Terry,* 180 Cal.App.2d 48, 57 [4 Cal.Rptr.

597].) Had the defendant, as claimed, wished the attendance of out-of-state witnesses, he should have taken timely action prior to the trial. Third, the findings of the coroner (Dr. Newbarr) were read into evidence by an associate, Dr. Chapman; the motion to strike this testimony upon the ground that Dr. Newbarr was not a witness was denied. The ruling was proper. An autopsy report is a record that the coroner is required to keep (Gov. Code, § 27491) and is, therefore, a public record. (*Schindler* v. *Superior Court*, 161 Cal.App.2d 513, 520 [327 P.2d 68].) Section 1920, Code of Civil Procedure, provides that entries in public or other official books or records, made in the performance of his duty by a public officer, are prima facie evidence of the facts stated therein. Since Dr. Chapman was testifying from public records kept by the coroner, such testimony was admissible under sections 1918 and 1920, Code of Civil Procedure. See *People* v. *Williams*, 174 Cal.App.2d 364 [345 P.2d 47]. Fourth, defendant argues that certain statements made by him to Officer Gorey were not free and voluntary. It appears that while he was en route to police headquarters, defendant made the following remark to Officer Gorey: "I didn't think that he'd go that hard route." The reference presumably was to Kerfoot. Previously, it seems, Officer Gorey had compelled defendant to come out of the bushes where he and Kerfoot were found. At that time Gorey assertedly threatened to blow defendant up; the officer, in turn, testified that such a threat was conditioned on defendant's refusal to surrender himself voluntarily. We perceive no error in the court's ruling, particularly since the jury was instructed that the remark above quoted should not be considered unless found by them to be voluntary. Fifth, there is a somewhat specious argument on certain rulings relating to testimony as to the taking of lie detector tests. To detail the argument would unduly prolong this opinion; suffice it to say, the claims are without merit. Sixth, objection is made to the introduction of the .38-calibre and .22-calibre weapons. We have already determined that the former was properly received in evidence. As for the .22-calibre gun, there could not have been an illegal search because it was found in an open yard. (*People* v. *Robles*, 183 Cal.App.2d 212, 215 [6 Cal.Rptr. 748].)

The next contention pertains to the asserted supression of evidence by the prosecution, namely, the Pontiac car used by defendant. But the record shows that he consented to

its removal from *California to* Nevada. Too, photographs were taken of the vehicle and they were available at the trial. There is no merit to the instant claim.

An examination of the evidence refutes the next assignment (of error) that the court erred in holding that the corpus delicti of murder had been established. The summary of facts, earlier summarized, and competent medical testimony compel no other conclusion than that the victim died from a gunshot wound received during the attempted robbery in question.

Defendant's final claim charges the prosecutor with prejudicial misconduct in having Kerfoot "paraded" before the jury. At various times, he points out, Kerfoot was brought into court and identified by various witnesses. But, it appears, defense counsel likewise chose to bring in Kerfoot and use him in the manner presently criticized. Complaint cannot, therefore, be made of the prosecutor's tactics, particularly since no objection was made thereto during the course of the trial.

The judgment and order are affirmed; all other purported appeals are dismissed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 13, 1963.