[Crim. No. 25383. Second Dist., Div. Five. Mar. 12, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
WARREN MARCHIALETTE, Defendant and Appellant.

## COUNSEL

David C. Tunick, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Donald J. Oeser and Owen Lee Kwong, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**LORING, J.**\*—Warren Marchialette (Marchialette) was charged with the murder of Leon Simmons (Simmons) with malice aforethought on March 4, 1973. An amended information charged that in the commission of the offense, he used a firearm and an amendment to the information charged two prior convictions—a violation of Penal Code section 192, subdivision 1 (voluntary manslaughter) on June 25, 1971, and a violation of Penal Code section 242 (battery) on November 18, 1971. He entered a plea of not guilty. He eventually admitted the two priors. A jury found defendant guilty of murder in the second degree and found that at the time he used a .45 caliber semi-automatic pistol. His motion for new trial and application for probation were denied and he was sentenced to state prison for the term prescribed by law, the sentence to run consecutively to any other sentence imposed.[1] He appeals from the judgment.

### CONTENTIONS

Appellant contends that the conviction should be reversed because the court erroneously:

I. allowed Ivory Joe Collier to testify regarding what he heard over the telephone at the time Simmons was allegedly shot by Marchialette;

II. denied his motion for acquittal;

---

\*Assigned by the Chairman of the Judicial Council.

[1]This apparently refers to sentences on the two priors. Since the punishment for second degree murder is for from five years to life (Pen. Code, § 190) the provision that the sentence run consecutively does not violate Penal Code section 669. (*People* v. *Kostal,* 159 Cal.App.2d 444, 453-454 [323 P.2d 1020]; *People* v. *Barrett,* 267 Cal.App.2d 135 [72 Cal.Rptr. 681].)

III. instructed on "Flight after Crime";

IV. instructed an "Admission—Defined";

V. instructed *sua sponte* on murder in the first degree;

VI. denied his motion for a new trial.

FACTS

Simmons died on March 4, 1973, as the result of four gunshot wounds.[2] The shots were fired from a .45 caliber weapon subsequently found (pursuant to a search warrant) in Marchialette's apartment.

Marchialette entered the Simmons residence at about 3:40 p.m., March 4, 1973. He was observed sitting on the steps by Vincent Zabuski "foreman in charge of maintenance." Simmons came out of his office, said he was on the phone and to wait a minute, and then went back into his office. Simmons left the door ajar. After about 30 seconds, Marchialette arose and followed Simmons into the office, shutting the door behind him which automatically locked it. Zabuski heard the door lock. In about a minute and a half to two minutes, Zabuski heard a yell, then along with the window breaking, a sharp sound. Then he heard the burglar alarm go off. They were almost simultaneous. Zabuski stood at the doorway. Marchialette opened the door and walked past him, closing the door behind him. It locked automatically. After a lapse of a minute or a minute and a half, Zabuski and five other employees went out on the street but could not find Marchialette. When they returned, the burglar alarm was still ringing. Zabuski went next door and called police. Zabuski finally entered the office through a window and found Simmons' body. Under the body was a "Prowler Fouler."[3] The switch for the burglar alarm was underneath the middle desk drawer.

Ivory Joe Collier testified that on a Sunday[4] in March 1973 in the afternoon he telephoned number 656-6400[5] in response to a newspaper

---

[2]The four shots all entered from the front, indicating that he was facing his assailant. Three were in the chest and one was in the upper abdomen, close to the chest.

[3]A "Prowler Fouler" is a mechanical device which propels an object (such as a bean bag) which is ejected by a carbon dioxide capsule.

[4]March 4, 1973, was a Sunday.

[5]He read the number from the ad. Simmons had placed an ad in the Los Angeles Free Press. His number was 656-6300. Zabuski had gotten his job the same way. The people claim that the discrepancy of "4" is typographical.

ad and talked to a man about a job which had been advertised in the Los Angeles Free Press. The man did not give his name. While Collier was talking to the man, there was a pause in the conversation. Collier heard a "kind of a knock" on the door. The man on the other end of the phone said, " 'Who is it?' Or something." The man said, "come on in. Just a minute. I'm with someone. I'm talking to someone." The man came back on the phone and resumed talking to Collier. Collier heard a different voice say, "Go ahead and push it." Then immediately the voice said, "Go ahead and push it and I'll blow your fucking brains out." Then Collier heard a burglar alarm "right quick" and he heard a shot. Collier then heard a lot of screaming in his ear on the telephone. Then he heard another scream, then another shot, he heard "them scream again." And "there was another shot." "There was the third shot and then [he] heard the telephone fall down and hit the desk or whatever he was standing and talking . . . the receiver." Then he "heard another shot and everything got quiet and faded away and the guy stopped hollering." Regarding the sequence of the shots, Collier testified there was a pause between the first and second shot and between the third and fourth shots, but the second and third shots were in rapid succession. It was the same sound each time. At first Collier thought it was a fake. He thought somebody was playing a game. Collier hung up the phone and called back the same number "to confirm it." He was not "going to leave it hanging." A voice said, "Can't talk to you now. There's been an accident here" and hung up. Collier then telephoned the police.

Marchialette was transported on March 14, 1973, to the U.S.C. Medical Clinic. En route (before he had been advised of his *Miranda* rights) he stated to Officer Estrada, "This will never go to court. I'll cop a plea to voluntary manslaughter." He also said, "Oh, shit." "The guy took a shot at me first, so I pumped four into him." Marchialette was asked if he was willing to make a written statement to that effect. He said he was. He was at the medical center about 15 minutes and the officers took him to an interrogation room in the police building at 115 North Los Angeles Street, where a tape-recorded statement was made after he was fully advised of and waived his *Miranda* rights, which were read from a card. The statements were repeated and tape recorded. The tape recording was played for the jury after portions were deleted.

## Discussion

Marchialette's argument that the court erroneously admitted evidence by Collier regarding what he heard over the telephone is

predicated on the assumption that what Collier heard was hearsay. The authorities are in disagreement as to whether such evidence is non-hearsay (see 6 Wigmore, § 1772) or admissible as an exception to the hearsay rule. (See Witkin, Cal. Evidence (2d ed. 1966) §§ 548, 549, p. 522.) Without characterizing such evidence Evidence Code section 1241[6] expressly declares that such evidence is not made inadmissible by the hearsay rule. Such statements testified to by Collier were clearly verbal acts which explain qualify or make understandable the conduct of the declarant and they were made while the declarant was engaged in such conduct. (*People* v. *Mehaffey,* 32 Cal.2d 535, 557 [197 P.2d 12]; *People* v. *Reifenstuhl,* 37 Cal.App.2d 402, 405 [99 P.2d 564]; *People* v. *Curtis,* 106 Cal.App.2d 321, 326 [235 P.2d 51].)

If Collier had been present in the office of Simmons at the time he could testify to what he saw and heard. Such would clearly have been competent evidence. If Collier had been blind and present in Simmons' office, he could testify to what he heard. Such would have been competent evidence. If Collier had been standing outside the door, he would testify to what he heard through the door. Such would have been competent evidence. If he had been in an adjacent office and the two offices had been connected by a public address system or a intercom-munication "box," he could testify to what he heard. Such would be competent evidence. The result does not change merely because what he heard was heard by means of a telephone. The testimony of Collier was competent. It was clearly relevant. It was direct ear-witness evidence of the actual homicide while it was in progress. It is true that the evidence was subject to different interpretations. The phrase "go ahead and push it" could have referred to either the "Prowler Fouler" (if so that interpretation might support the defense of self-defense) or it could have referred to the burglar alarm. The fact that the burglar alarm went off almost simultaneously, apparently induced the jury to conclude that the phrase referred to the burglar alarm not to the "Prowler Fouler." In any event, the correct interpretation was a question of fact for the jury, not a question of law for the court. (*People* v. *Cannedy,* 270 Cal.App.2d 669, 676-677 [76 Cal.Rptr. 24].)

■ Marchialette further complains that there was inadequate foun-

---

[6]Section 1241 reads:

"Evidence of a statement is not made inadmissible by the hearsay rule if the statement:

"(a) Is offered to explain, qualify, or make understandable conduct of the declarant; and

"(b) Was made while the declarant was engaged in such conduct."

dation that he was the speaker. The totality of the evidence—the testimony of the eyewitness Zabuski that Marchialette entered Simmons' office just before the burglar alarm went off; that he left the office while it was still ringing; the testimony that Marchialette admitted that he pumped four shots into Simmons; the autopsy report that Simmons died from four gunshot wounds; that Collier telephoned Simmons' telephone number, all taken together provided ample foundation for the admission of Collier's testimony and the jury's conclusion that Marchialette was the declarant whose statements Collier heard and testified to. There was ample foundation for the admission of Collier's testimony which was competent and relevant.

Marchialette contends that the prosecution evidence that he (Marchialette) declared 10 days after the homicide that "the guy took a shot at me first, so I pumped four into him" demonstrates as a matter of law (there being no evidence to the contrary) that Marchialette shot Simmons in self-defense. Marchialette contends that the trial court should have granted his motion for acquittal. The vice of the argument is the unjustified assumption that there was no evidence to the contrary. There was evidence to the contrary. According to Collier, only four shots were fired. Simmons had four bullet holes in him. The jury could justifiably conclude Simmons therefore did not fire any of the four shots. If only four shots were fired and none of the four were fired by Simmons, then the jury could properly conclude that Marchialette's self-serving declaration, "The guy took a shot at me first" was not true. Furthermore, no weapon (other then the Prowler Fouler) was found in the room which could have been fired by Simmons. Since the Prowler Fouler fired an object like a bean bag and no such object was found in the room, the jury could conclude that Simmons did not fire the Prowler Fouler at Marchialette. The prosecution evidence therefore did not establish self-defense as a matter of law. It was a proper jury function to resolve the conflicts in the evidence. (*People* v. *Acosta,* 45 Cal.2d 538, 542 [290 P.2d 1]; *People* v. *Lane,* 56 Cal.2d 773, 784 [16 Cal.Rptr. 801, 366 P.2d 57]; *People* v. *Chapman,* 261 Cal.App.2d 149, 177 [67 Cal.Rptr. 601].) The trial court correctly denied the motion for acquittal.

Marchialette contends that the court erroneously gave CALJIC No. 2.52.[7] It is clear that Simmons died as the result of four gunshot wounds

[7]CALJIC No. 2.52 reads: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

inflicted upon him during the space of a very few minutes while Marchialette was alone with Simmons in his office. Marchialette left the office hastily without explanation or attempting to render assistance which an innocent law-abiding citizen would normally do. He departed the area in such a manner that he could not be found when six persons searched for him a minute or two later. It was for the jury to determine whether or not the conduct of Marchialette, under the circumstances, constituted "flight" evidencing a consciousness of guilt, and if so, what weight or significance to attach to it. (*People v. Olea,* 15 Cal.App.3d 508, 515-516 [93 Cal.Rptr. 265]; *People v. Crawford,* 259 Cal.App.2d 874, 879 [66 Cal.Rptr. 527]; *People v. Moore,* 211 Cal.App.2d 585, 600-601 [27 Cal.Rptr. 526].)

■ We next consider Marchialette's argument that the court committed error in deleting the cautionary portion of CALJIC No. 2.71. The instruction as given reads:

"A statement made by a defendant other than at his trial may be an admission.

"An admission is a statement by a defendant, which by itself is not sufficient to warrant an inference of guilt, but which tends to prove guilt when considered with the rest of the evidence.

"You are the exclusive judges as to whether an admission was made by the defendant and if the statement is true in whole or in part. If you should find that such statement is entirely untrue, you must reject it. If you find it is true in part, you may consider that part which you find to be true.

". . . . . . . . . . . . . . . . ."

The portion deleted reads:

"Evidence of an oral admission of the defendant ought to be viewed with caution."

The record is clear that the deleted portion was deleted at the insistence of defense counsel. The deletion may not therefore be assigned as error on appeal. (*People v. Graham,* 71 Cal.2d 303, 319 [78 Cal.Rptr. 217, 455 P.2d 153].)

Marchialette complains that the court committed prejudicial error by giving *sua sponte* CALJIC No. 8.20 relating to murder in the first degree. Marchialette was convicted of murder in the second degree. Assuming without deciding that the giving of the instruction *sua sponte* was error, we conclude that beyond a reasonable doubt, it was not prejudicial. (*People* v. *Watson,* 46 Cal.2d 818, 837 [299 P.2d 243].)

The final argument of Marchialette that the court committed error in denying his motion for a new trial because there was no substantial evidence of guilt is clearly devoid of merit. The motion was addressed to the sound discretion of the trial judge who was required to independently weigh the evidence (*People* v. *Serrato,* 9 Cal.3d 753, 761 [109 Cal.Rptr. 65, 512 P.2d 289]) whose decision will not be disturbed in the absence of showing of abuse of discretion (*People* v. *Robarge,* 41 Cal.2d 628, 633 [262 P.2d 14]) which is not shown here.

The judgment is affirmed.

Ashby, Acting P. J., and Hastings, J., concurring.

A petition for a rehearing was denied April 1, 1975, and the opinion and judgment were modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied May 28, 1975.